UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Martin Demetrio Morales,

        Plaintiff,

        v.                           Civil Action No. 2:13-cv-271

Andrew Pallito,

        Defendant.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 3, 6, 12, 14, 20)

Plaintiff Martin Demetrio Morales, proceeding *pro se*, brings this action under 42 U.S.C. § 1983 against Defendant Andrew Pallito, Commissioner of the Vermont Department of Corrections (DOC).  (Doc. 6.)  Morales challenges the constitutionality of certain DOC rules and regulations that prohibit consensual sexual conduct among inmates in the DOC's custody.  He also challenges the constitutionality of the DOC's failure to implement a conjugal visiting program, as well as what he claims is the discriminatory effect of the Prison Rape Elimination Act (PREA).  For relief, Morales seeks orders requiring the DOC to implement a conjugal visiting program and to allow minimum and medium security prisoners to engage in sexual activity with one another.  (Doc. 6-3.)  He also seeks compensatory, punitive, and nominal damages.  (*Id.*)

The following motions are currently pending: two Motions to appoint counsel filed by Morales (Docs. 3, 14); Pallito's Motion to Dismiss for Failure to State a Claim

(Doc. 12); and Morales's Renewed Motion for Default Judgment (Doc. 20).[1]  For the reasons stated below, I recommend that Morales's Motion on the issue of default judgment (Doc. 20) be DENIED, that Pallito's Motion to Dismiss (Doc. 12) be GRANTED, and that Morales's Motions to Appoint Counsel (Docs. 3, 14) be DENIED as moot.

## Factual Background

The basic allegations in the Complaint are as follows.[2]  The DOC maintains several correctional facilities in Vermont; no facility has a mixed-sex population of inmates.  (*See* Doc. 6-1 at 50.)  Morales is an inmate in the custody and control of the DOC; he has been continuously incarcerated since February 28, 2011.  He has lived an "openly homosexual lifestyle" since January 2011.  (*Id.* at 6.)  He has repeatedly engaged in consensual mutual "above-the-clothing" sexual activity with other inmates as well as DOC staff.  (*Id.* at 13–14.)  However, during the time that he has been incarcerated, he has not engaged in "beneath-the-clothing" sexual activity.  (*Id.*)

Morales states that the DOC does not allow prisoners to engage in mutually consenting sexual activity, nor does the DOC allow conjugal visits.  (*Id.* at 2.)  Indeed, under DOC policy, it is a violation (classified as a "Major B06") for an inmate to

---

[1]  Morales has also filed a "Motion in Response" (Doc. 21) to the Court's February 3, 2014 Order (Doc. 19).  The "Motion in Response" is also addressed to the issue of default, and is discussed below.

[2]  The Complaint is lengthy, and includes—among numerous attachments such as copies of Morales's handwritten journal entries and copies of academic materials—more than 120 handwritten pages, most of which constitute legal argument rather than factual background.  (*See* Docs. 6-1; 6-2.)  For present purposes, I recite the pertinent factual allegations in Morales's Complaint, as well as certain DOC policies, all of which may be judicially noticed.  *See* Fed. R. Evid. 201(b), (d); *see also Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (district courts may take judicial notice of state prison rules and regulations).

"[m]ak[e] sexual proposals to another person, including, but not limited to: repeated sexual advances, requests for sexual favors, verbal comments, or gestures or actions of a derogatory or offensive sexual nature by one inmate directed toward another inmate or staff person."  State of Vermont, Agency of Human Services, Department of Corrections, "Facility Rules and Inmate Discipline," #410.01 (2012) [hereinafter "Policy 410.01"], at 19, *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/410-01-facility-rules-and-inmate-discipline.pdf.  The same policy makes it a violation (classified as a "Major B17") for an inmate to:

> Engag[e] in sexual acts or activity without use or threat of force, to include but not limited to, kissing, fondling of self or another person in a manner, which produces or is intended to produce sexual stimulation or gratification without the appearance of threat or harm on the part of both persons.

*Id.* at 20.  DOC policy also makes it a violation (classified as a "Major A23") for an inmate to engage in the "[u]nauthorized use of the mail or telephone."  *Id.* at 19.[3]

Commissioner Pallito signed and approved each of these policies.

During his incarceration, Morales has been investigated 23 times under the PREA.[4]  On February 26, 2013, Morales was issued a Major B06 Disciplinary Report

---

[3]  A separate DOC policy—which is not effective until June 2, 2014—proclaims that "[i]nmates under the custody of the Department are never regarded as being able to consent to any kind of relationship.  No matter who initiates the contact or how 'consensual' the relationship is, it is considered a rule violation by inmates and an abuse of power by staff."  State of Vermont, Agency of Human Services, Department of Corrections, "Prison Rape Elimination Act (PREA) & Staff Sexual Misconduct—Facilities," #409.09 (eff. June 2, 2014), at 1, *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/401-500-programs-security-and-supervision/409-09-prison-rape-elimination-act-prea-staff-sexual-misconduct-facilities.

[4]  The PREA is codified at 42 U.S.C. §§ 15601–15609.  "National standards" under the PREA appear in Part 115 of Title 28 of the Code of Federal Regulations.

(DR) for romantic correspondence with his then-boyfriend.  He was found guilty after a March 1, 2013 hearing.  Between April 3 and April 8, 2013, Morales was placed in segregation for allegedly sharing an embrace with a bisexual prisoner.  A subsequent investigation determined that the embrace was not of a sexual nature.  On June 29, 2013, Morales was issued a Major A23 DR for writing a romantic letter to a fellow homosexual prisoner.  He was found guilty after a July 5, 2013 hearing.  For both the February 26, 2013 DR and the June 29, 2013 DR, Morales pursued administrative appeals, including appeals to Commissioner Pallito, but received no favorable response at any level.

In a "Decision Appeal to Commissioner" dated June 15, 2013 and apparently filed directly with the Commissioner's office, Morales stated that he sought to bring "several issues pertaining to perceived VT DOC homophobia" to Commissioner Pallito's attention.  (Doc. 6-14 at 2.)  Morales wrote:

> My issues include unlawful segregation of two homosexual prisoners based on unsubstantiated VT DOC allegations, retaliatory unit changes of homosexual prisoners, retaliatory transfer of a homosexual prisoner, denial of 3 inmates' request[s] to correspond for legal purposes, denial of two homosexual prisoners' right to marriage absent a compelling governmental interest, retaliatory DRs issued to homosexual prisoners, denial of a homosexual prisoner's request to be a bridesmaid, unconstitutional gender classifications of homosexual prisoners, denial of meaningful access to the courts for homosexual prisoners, VT DOC's . . . threats, and other chilling effects on homosexual prisoners exercising constitutional rights, among other violations committed by VT DOC against homosexual prisoners.

(*Id.*)  It does not appear that the Commissioner responded to Morales's June 15 letter.

## **Procedural History**

In May 2013, Morales filed an action in Vermont state court that is substantially similar to the action in this Court.  (*See* Docs. 6-1; 6-2) (Parts 1 and 2 of Morales's

August 20, 2013 Motion to Amend his petition under V.R.C.P. 75).[5]  It appears from the

"Vermont Courts Online" website, available at https://secure.vermont.gov/vtcdas/user,

that Morales has since dismissed the Rule 75 case.[6]

The following additional procedural history is relevant to Morales's Motion

concerning default judgment.  Morales filed his Complaint on October 11, 2013.  (Doc.

6.)  On October 15, 2013, a request for a waiver of service was issued to Andrew Pallito.

On October 30, 2013, Pallito filed waivers of the service of summons (for both his

individual and official capacities), indicating the understanding that an answer or a Rule

12 motion would be due "within 60 days from 10/15/2013, the date when this request was

sent."  (Doc. 9.)  Pallito filed the pending Motion to Dismiss on December 17, 2013.

(Doc. 12.)

On January 9, 2014, Morales filed a "Motion Requesting Entry of Default

Judgment" against Pallito.  (Doc. 15.)  In that Motion, dated December 22, 2013, Morales

asserted that Pallito's Motion to Dismiss was untimely because, according to Morales, the

deadline for a response to be filed was December 14, 2013.  (*Id.* at 2.)  In an Order dated

February 3, 2014, the Court denied Morales's Motion for Default.  (Doc. 19.)  The Court

reasoned that Morales had not sought an entry of default under Fed. R. Civ. P. 55(a), and

that his claims were not for a sum certain under which a judgment of default would be

appropriate pursuant to Rule 55(b)(1).  (*Id.* at 2.)  The Court proceeded to analyze

---

[5]  The state court case was docketed *Morales et al. v. Pallito*, No. 229-5-13 Frcv.

[6]  The Court may take judicial notice of the docket sheet in the Vermont Superior Court action
because it is a public record and because Morales's Complaint incorporates documents from that case.
*See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).

Morales's Motion under Rule 55(b)(2), and concluded that entry of a default judgment was not appropriate.  (*Id.* at 2–3.)

On February 10, 2014, Morales filed a "Motion to Narrowly Tailor Relief Requested / Renewal for Request of a Default Judgment."  (Doc. 20.)  In that Motion, Morales articulates six categories of relief that he seeks: (1) orders requiring the DOC to permit inmates to engage in consensual sexual activity and to implement a conjugal visiting program; (2) an order precluding the DOC from disciplining inmates for possessing condoms; (3) a declaration that DOC's policies banning consensual sexual activity between inmates are unconstitutional; (4) compensatory damages; (5) punitive damages; and (6) nominal damages.  (*Id.*)  On February 12, 2014, Morales filed a "Motion in Response" to the Court's February 3, 2014 Order.  (Doc. 21.)  In that filing, Morales disputes certain statements and conclusions in the Court's Order.

## <u>Analysis</u>

## I.    **Default Judgment**

Morales's Motion on the issue of default judgment should be DENIED.  His January 9, 2014 Motion for Default could not have supplied a basis for the Clerk of Court to enter a default under Rule 55(a) or to enter a default judgment under Rule 55(b)(1).  As the Court previously concluded, Morales's demand was not for a "sum certain"—a requirement for the Clerk to enter a default judgment under Rule 55(b)(1).  Here, Morales seeks injunctive or declaratory relief in addition to damages,[7] and despite the fact that

---

[7]  Morales's recent restatement of his requested relief (Doc. 20) does not change those facts.

Morales has articulated dollar figures for the damages that he seeks, that does not make his claim one for a "sum certain."  *See Davis v. Nat'l Mortg. Corp.*, 320 F.2d 90, 92 (2d Cir. 1963) (per curiam) (hearing is required before entering a default judgment for unliquidated damages claim).  If Morales's requests for specific amounts of damages were sufficient to make his claim one for a "sum certain," then any unliquidated claim could be made into a claim for a "sum certain."

Moreover, by the time of Morales's January 9, 2014 Motion for Default, Pallito had already filed the Motion to Dismiss; thus Pallito had not failed to "otherwise defend" under Rule 55(a).  *See* 10A Charles Alan Wright et al., *Federal Practice and Procedure: Civil 3d* § 2682 ("[A] motion challenging the complaint for failure to state a claim upon which relief can be granted is within the notion of 'otherwise defend.'").  For the same reason, the Clerk could not have entered a default judgment under Rule 55(b)(1).  *See id.* § 2683 ("[A] default judgment only should be entered by the clerk as a matter of course when a defendant clearly has defaulted and has displayed no interest in participating in the action.").

Still, Pallito's Rule 12(b) Motion was untimely,[8] and Morales was entitled to apply to the Court for a default judgment pursuant to Rule 55(b)(2).  However, for the reasons the Court previously articulated (*see* Doc. 19 at 3), the tardiness of Pallito's Motion— while not to be commended—should not result in a default judgment.  Pallito's Rule 12

---

[8]  Morales disputes the Court's earlier conclusion that the Motion was one day late; according to him, Pallito's Motion was three days late.  Morales is incorrect.  Under the applicable rules, an answer or a Rule 12(b) motion was due within 60 days of October 15, 2013, the date the request for a waiver was sent.  Fed. R. Civ. P. 4(d)(3); 12(a)(1)(A)(ii), (a)(4).  Under Rule 6(a)(1), an answer or a Rule 12(b) motion was therefore due by Monday, December 16, 2013.  In any case, it would make no difference to the analysis whether Pallito's Motion was one day late or three days late.

Motion was not excessively tardy, and there was no showing that the delay was willful or caused prejudice to Morales. Moreover, the Court suggested that Pallito likely had a meritorious defense.[9] In addition, there is a general preference to decide disputes on their merits. For all these reasons, the Court should DENY Morales's Motion on the issue of default judgment (Doc. 20).

## II.   Commissioner Pallito's Motion to Dismiss

Commissioner Pallito seeks dismissal of Morales's Complaint, arguing that: (1) Morales's claims for money damages against Pallito in his official capacity are barred by Vermont's sovereign immunity; (2) Pallito cannot be liable in his individual capacity because he was not personally involved in enacting the PREA; (3) inmates have no protected liberty interest in sexual relations while incarcerated; (4) Morales has failed to allege an equal protection claim; and (5) Morales failed to exhaust his administrative remedies. (Doc. 12 at 2–8.) Morales opposes Pallito's Motion. (Doc. 13.)

### A.   Legal Standard and Applicable Law

To survive a Rule 12(b)(6) motion to dismiss, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

---

[9] As discussed below, I conclude that Commissioner Pallito does in fact have meritorious defenses.

191 (2d Cir. 2007).  However, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "'[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).

"Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *Baker v. Cuomo*, 58 F.3d 814, 818–19 (2d Cir. 1995), *vacated in part on other grounds on reh'g*, *Baker v. Pataki*, 85 F.3d 919, 921 (2d Cir. 1996) (en banc) (per curiam).  In addition, where, as here, the plaintiff is proceeding *pro se*, courts are obligated to construe the pleadings liberally.  *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).  Nevertheless, a *pro se* plaintiff's complaint must still state a claim to relief that is plausible on its face.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).

Morales brings this suit under 42 U.S.C. § 1983.  Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (2d

Cir. 1992).  "A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges."  *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).[10]

### B.     Eleventh Amendment

Commissioner Pallito asserts that the Eleventh Amendment bars Morales's § 1983 claim against him in his official capacity to the extent that Morales seeks money damages.  (Doc. 12 at 3.)  The Eleventh Amendment generally prohibits plaintiffs from recovering in federal court damages against state officials in their official capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) ("[A] claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment.").  There are exceptions to that general rule.  A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985).  In addition, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).  However, Vermont has expressly preserved its immunity under the Eleventh Amendment, *see, e.g.*, 12 V.S.A. § 5601(g),

---

[10]  Morales argues that his position is supported by the Vermont Constitution and other provisions of Vermont law.  (*See* Doc. 6-2 at 60–65.)  In a § 1983 suit, the question is whether the plaintiff's *federal* rights or privileges have been denied.  Morales does not appear to be asserting any independent state-law claim, but instead is attempting to use Vermont law to support his federal claims.  The analysis herein is therefore limited to questions of federal law.

and Congress did not intend to abrogate sovereign immunity by enacting § 1983, *see Quern v. Jordan*, 440 U.S. 332, 340–41 (1979).

Since neither exception applies, the Court should grant Pallito's Motion insofar as it seeks dismissal of any claims that Morales is making for money damages against him in his official capacity. Of course, that conclusion would not warrant dismissal of the case, since Morales seeks injunctive relief as well as money damages,[11] and is also suing Pallito in his individual capacity. (*See* Doc. 6-2 at 47) ("Andrew Pallito is being sued in both his individual and official capacity.").

### C.    Personal Involvement

Commissioner Pallito argues that the portion of the Complaint that attacks the PREA as having a discriminatory effect on homosexuals should be dismissed because Pallito was not personally involved in enacting the PREA and has no discretion regarding compliance with its requirements. (Doc. 12 at 4.) Morales maintains that, even though Pallito himself did not conduct any PREA investigations, he may be liable because he was informed of the discriminatory effect of the investigations through Morales's grievances but took no action. (Doc. 13 at 14.) Morales also contends that Pallito was grossly negligent in supervising his subordinates and was deliberately indifferent. (*Id.*)

Morales's PREA claim is not a complaint that the PREA bans all sexual activity between inmates; Morales himself notes that the PREA does not do that. (Doc. 13 at 13.) Indeed, the PREA is focused on preventing rape in prisons, *see* 42 U.S.C. § 15602, and

---

[11] Pallito asserts that the Complaint does not expressly seek monetary relief. (Doc. 12 at 2.) That is incorrect. (*See* Doc. 6-3; Doc. 20 at 2–3.)

"rape" as defined in the PREA does not include consensual sex acts, *id.* § 15609(9).[12]

What the PREA does do is tie federal funding to compliance with certain "national

standards," including standards for detecting, preventing, reducing, and punishing prison

rape. *See id.* §§ 15602(3), 15607.  Morales's PREA claim is that the PREA has a

discriminatory effect because homosexuals "are the focus of virtually every PREA

investigation in Vermont's correctional facilities."  (Doc. 13 at 12.)

"'It is well settled in this Circuit that personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under

§ 1983.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013)

(quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  Commissioner Pallito

"cannot be held personally liable under § 1983 on the basis of *respondeat superior*" or

simply because he "sits atop the prison hierarchy."  *Thompson v. Pallito*, 949 F. Supp. 2d

558, 573 (D. Vt. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995)).

However, the Second Circuit has held that:

> [t]he personal involvement of a supervisory defendant may be shown by
> evidence that: (1) the defendant participated directly in the alleged
> constitutional violation, (2) *the defendant, after being informed of the
> violation through a report or appeal, failed to remedy the wrong,* (3) the
> defendant created a policy or custom under which unconstitutional practices
> occurred, or allowed the continuance of such a policy or custom, (4) the
> defendant was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) *the defendant exhibited deliberate
> indifference to the rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.*

---

[12]  Notably, although the PREA does not mandate a ban on all sexual activity between inmates,
the PREA regulations explicitly state that such bans are permissible.  *See* 28 C.F.R. § 115.78(g) ("An
agency may, in its discretion, prohibit all sexual activity between inmates and may discipline inmates for
such activity.").  The constitutionality of Policy 410.01's ban is discussed below.

*Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (quoting *Colon*, 58 F.3d at 873). To the extent that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), might have eliminated or altered any of the *Colon* avenues for showing a supervisor's personal involvement, that is not an issue in this case because, for the reasons described below, the Complaint does not adequately plead Commissioner Pallito's personal involvement even under *Colon*.

Morales argues that Commissioner Pallito is liable under the second, fourth, and fifth *Colon* categories. However, Morales's claim of grossly negligent supervision is entirely conclusory. Moreover, Commissioner Pallito's alleged failure to act on Morales's administrative appeals or to "remedy the wrong" alleged in those appeals is insufficient. "[A] supervisory official having received (and ignored) a letter from an inmate alleging unconstitutional conduct does not, without more, give rise to personal involvement on the part of that official." *Thompson*, 949 F. Supp. 2d at 575. "The reason for this rule appears to be the fact that high-level DOCS officials delegate the task of reading and responding to inmate mail to subordinates, and, thus, a letter sent to such an official often does not constitute actual notice." *Id.* (quoting *Voorhees v. Goord*, No. 05 Civ. 1407(KMW)(HBP), 2006 WL 1888638, at *5 (S.D.N.Y. Feb. 24, 2006)). "[I]mposing liability upon a supervisory official for failing to respond to an inmate's letter or grievance would contravene the black-letter principle that § 1983 does not allow for *respondeat superior* liability." *Id.* at 576.

Based on the above, the Court should grant Commissioner Pallito's Motion insofar as it seeks dismissal of Morales's § 1983 PREA claim against Pallito for damages. To

the extent that Morales seeks other remedies for the alleged discriminatory effect of PREA, I treat that issue below together with the discussion of the alleged discriminatory effect of Policy 410.01's ban on sexual acts or activity.

### D.   Exhaustion of Administrative Remedies

Commissioner Pallito asserts that Morales has failed to exhaust his administrative remedies because he filed grievances directly with the Commissioner before first filing them at lower levels of administrative review; and because the grievance forms that appear in the Complaint are not signed by the receiving officer.  (Doc. 12 at 8.)  Morales maintains that he is permitted to file grievances directly with the Commissioner under 28 V.S.A. § 854(2), which provides: "All inmates shall be allowed to communicate grievances directly to the commissioner, and an inmate's right to file grievances shall not be restricted."  (*See* Doc. 13 at 21.)[13]

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA also provides that, when a complaint fails to state a claim upon which relief can be granted, a court "may dismiss the underlying claim without first requiring the exhaustion

---

[13]  A DOC policy states: "While an offender/inmate may write the Commissioner at any time, the offender grievance system will be the administrative process which will enable the resolution of conflict in a timely manner and identify opportunities for quality improvement."  State of Vermont, Agency of Human Services, Department of Corrections, "Offender Grievance System for Field and Facilities," #320.01 (eff. Jan. 1, 2007), *available at* http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/301-335-facilities-general/320.01.pdf.  The same policy requires staff members who receive formal grievances from inmates in facilities to "sign and date the form, indicating they have received it."  *Id.*

of administrative remedies."  42 U.S.C. § 1997e(c)(2).  For the reasons discussed below,

Morales has failed to state a claim upon which relief can be granted.  It is therefore

unnecessary to determine whether Morales has failed to exhaust his administrative

remedies.

### E.      No Violation of Any Constitutional Right

As noted above, Commissioner Pallito argues that inmates have no protected

liberty interest in sexual relations while incarcerated, and that Morales has failed to allege

an equal protection claim.  In short, Pallito asserts that Morales has not alleged a

necessary element of a § 1983 claim: the denial of any federal statutory right or any

constitutional right or privilege.  Morales maintains that his Complaint does allege a

violation of a federally protected right.  (*E.g.*, Doc. 13 at 6; Doc. 6-2 at 48.)

The Court should reject Morales's demand for a conjugal visiting program.

Although prison inmates retain many of their constitutional rights, "such protections are

restricted by valid penological objectives."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d

Cir. 1994), *cert. denied*, 513 U.S. 836 (1994).  For example, prisoners retain the right to

marry as well as the right to "maintain their procreative abilities for later use once

released from custody," but have no right under any provision of the Constitution to

conjugal visitation privileges while incarcerated.  *Id.* at 136–37 (citing *Turner v. Safley*,

482 U.S. 78, 95–96 (1987)).

If inmates have no constitutional right to conjugal visitation with individuals from

outside the prison walls, then it is difficult to see how they might enjoy a constitutional

right to similar visitation with other inmates.  Morales asserts that there is a difference.

15

(*See* Doc. 13 at 15) (asserting that *Hernandez* "deals with conjugal visitation, outsiders coming in, not mutually consenting sexual activity between incarcerated individuals"). But Morales does not articulate any basis for drawing that distinction, and I can discern none.  Since prisoners have no constitutional right to sexual contact with their spouses, I conclude that they also have no constitutional right to sexual contact with their fellow inmates.[14]

Other courts have reached similar conclusions.  The Supreme Court has itself suggested that abolishing contact visits altogether would be a reasonable alternative to conducting body-cavity inspections after contact visits, at least with respect to inmates other than pretrial detainees.  *Bell v. Wolfish*, 441 U.S. 520, 559 n.40 (1979).  The Court plainly did not view such abolition as either unreasonable or unconstitutional.

In *George v. Lane*, the plaintiff brought a § 1983 claim alleging, among other things, that the Illinois Department of Corrections' regulations governing consensual sex between inmates violated his rights under the First, Fifth, and Fourteenth Amendments. No. 82 C 7084, 1987 WL 10573, at *1 (N.D. Ill. Apr. 30, 1987).  The court granted the defendant's motion to dismiss, reasoning that, to advance "legitimate penological objectives like maintaining prison security and discipline," prison officials "are permitted to forbid prisoners from undertaking numerous activities permitted to those in free society" and that "[n]o doubt the[r]e are numerous justifiable reasons for banning both

---

[14]   According to Morales, "[e]ngaging in sexual activity is a 'serious medical need,'" (Doc. 6-2 at 27), and "science recognizes sexual intimacy as a need," (*id.* at 40.)  It is well settled that "prison officials violate the Constitution when they deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  But sexual intimacy is not listed among the "basic human needs" that prison officials must provide to inmates.

voluntary and involuntary sex among inmates." *Id.* The court further reasoned that prisoners are deprived of their private lives, and that there was no constitutional merit to a challenge to rules that prohibit voluntary sex in a public place such as a prison. *See id.* at *2.

In his Opposition, Morales cites *Roe v. Wade*, 410 U.S. 113 (1973), and *Griswold v. Connecticut*, 381 U.S. 479 (1965). Those cases are not directly relevant to the issue in this case, but they do form part of the legal backdrop for the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003). Morales cites *Lawrence* (*see* Doc. 6-11 at 15), but neither party has offered analysis on the potential impact of *Lawrence* upon *Hernandez* and other pre-*Lawrence* cases such as *Bell v. Wolfish* and *George v. Lane*.[15] I conclude that it is necessary to address the *Lawrence* decision, although I also conclude that it is distinguishable.

In *Lawrence*, the Supreme Court acknowledged that adults may choose to enter personal relationships "in the confines of their homes and their own private lives" and that "[t]he liberty protected by the Constitution allows homosexual persons the right to make this choice." *Id.* at 567. The Supreme Court accordingly overruled its holding in *Bowers v. Hardwick*, 478 U.S. 186 (1986), and struck down a Texas statute criminalizing intimate sexual conduct between two persons of the same sex. *See Lawrence*, 539 U.S. at 578. Since *Lawrence*, the Second Circuit has recognized that "individuals have a due

---

[15] At least one commentator has suggested that *Lawrence*, "properly understood, . . . raises serious questions as to whether broad bans on consensual sexual expression between inmates can continue to stand." Russell K. Robinson, *Masculinity as Prison: Sexual Identity, Race, and Incarceration*, 99 Cal. L. Rev. 1309, 1316 n.30 (2011). Despite that pronouncement, Professor Robinson says that he leaves any such argument "for another day," and notes that no court has held that prisoners have a constitutional right to have consensual sex with each other. *Id.* at 1316 & n.30.

process right to be free from undue interference with their procreation, sexuality, and family." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 n.6 (2d Cir. 2004) (citing *Lawrence*).  The Supreme Court has itself reiterated the conclusion in *Lawrence*, noting that "[p]rivate, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form 'but one element in a personal bond that is more enduring.'" *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013) (quoting *Lawrence*, 539 U.S. at 567).

But the *Lawrence* Court did not hold that *all* sexual conduct—even between consenting adults—is protected by substantive due process.  *See Cook v. Gates*, 528 F.3d 42, 56 (1st Cir. 2008) ("*Lawrence* did not identify a protected liberty interest in all forms and manner of sexual intimacy.  *Lawrence* recognized only a narrowly defined liberty interest in adult consensual sexual intimacy in the confines of one's home and one's own private life."), *cert. denied*, 556 U.S. 1289 (2009).  In fact, the Court in *Lawrence* listed a variety of circumstances that the case did *not* involve, suggesting that in those circumstances the analysis would be different: "The present case does not involve minors.  It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.  It does not involve public conduct or prostitution." *Lawrence*, 539 U.S. at 578.  The *Lawrence* Court specifically recognized that there is a "spatial" dimension to the liberty it described, and noted that there are some "spheres of our lives and existence" where the State might be a "dominant presence." *Id.* at 562.

Unlike a private residence, in a prison facility the State exerts a "dominant presence."  That fact alone immediately suggests that *Lawrence* is distinguishable. Consensual sexual intimacy between inmates in a correctional facility was not recognized as a constitutionally protected right in *Lawrence*.  The Second Circuit's decision in *Hernandez* therefore continues to control.  Moreover, even if Morales could identify some constitutional right, the DOC's regulations would survive review in any case for the reasons discussed below.

Although the *Lawrence* Court did not explicitly state what level of review might be applied to a law or regulation that burdens an individual's expression of his or her sexuality, I conclude that Morales's claim to a constitutional right of consensual sexual activity with other inmates fails even under the heightened scrutiny outlined in *Turner v. Safley*, 482 U.S. 78 (1987).[16]  In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.  "The reasonableness of a prison regulation is measured by the three-step analysis outlined by the Supreme Court in *Turner* . . . ."  *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004).

> First, we ask whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective.  Second, we look to see whether there are alternative means of exercising the right that remain open to prison inmates.  Third, we examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison.

---

[16]  The Second Circuit has held that "*Turner* does not govern equal protection claims brought by prisoners that do not involve suspect groups or fundamental rights," and that traditional rational basis review would instead govern such claims.  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 136–37 (2d Cir. 2013).  It is unnecessary to decide in this case whether *Turner* actually applies because even if it does, Morales fails to state a claim.

*Id.* (citations and internal quotation marks omitted).  Morales bears the burden of proving that the DOC policies at issue are unreasonable.  *See id.* (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995)).

I begin with the first *Turner* factor.  Policy 410.01 articulates why the DOC has concluded that conduct at issue is a "major" violation.[17]  Namely, all "major" violations constitute "violent acts" or "threats to institutional security or personal safety," with "Major B" violations being somewhat less "serious" than "Major A" violations.  Policy 410.01 at 7.  Preventing violence and maintaining prison security are "obviously legitimate" purposes.  *Senkowski*, 54 F.3d at 1054.  Moreover, DOC Policy 410.01's ban is neutral in the "technical sense" because, although it does suppress (sexual) expression, it does so without regard to the type of expression, and in order to further the DOC's interest in safety and security.  *Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989).  The only potential issue is whether there is a "valid, rational connection" between those purposes and the DOC policies banning sexual acts and activity.

Morales asserts that the DOC policies are harmful in a variety of ways, and actually increase the risk of violence, and undermine safety and security in prisons. (Doc. 6-1 at 14–15, 66–67.)  Some commentators have made similar arguments.  *E.g.*, Ronald G. Turner, *Sex in Prison*, 36 Tenn. B.J. 12, 25–26, 27–28 (Aug. 2000) (noting benefits of conjugal visits, and suggesting that denying inmates an outlet for their sexual energy contributes to a dangerous "powder keg"); *see also* Robinson, 99 Cal. L. Rev. at

---

[17]  Morales asserts that he has heard the DOC advance other reasons for Policy 410.01's ban, and claims that those reasons are "absurd."  (*See* Doc. 6-1 at 52–62.)  I focus on the stated rationale for Policy 410.01 as expressed in the policy itself.

1316 (asserting that bans on sexual activity "may deter inmates from reporting sexual assault because prison officials can recharacterize a claim of rape as consensual activity, which is forbidden"); Brenda V. Smith, *Rethinking Prison Sex: Self-Expression and Safety*, 15 Colum. J. Gender & L. 185, 186 (2006) (asserting that "in many situations the prison does not have a legitimate interest in prohibiting prisoner sexual expression and would be better served by using scarce resources to protect prisoners from nonconsensual and coercive sex by staff or other inmates").[18]

It is impossible in the present procedural posture of this case to thoroughly evaluate those arguments.  However, the Court need not delve into that particular fray. To the extent that there are "workable and humane approaches" to balancing the interests of safety and security in prisons with the inmates' interests in self-expression, it is up to the "correctional authorities"—not the courts—to identify and determine whether to implement them.  Smith, 15 Colum. J. Gender & L. at 187.  The present inquiry is not whether the DOC's policies are wise, but rather, whether they are constitutional.[19]

---

[18]  In his Complaint, Morales supplies numerous quotations from Professor Smith's article.  (*See* Doc. 6-2 at 3–7.)

[19]  Morales contends that the DOC's policies are in violation of the Geneva Conventions and the Universal Declaration of Human Rights (UDHR).  (Doc. 6-1 at 48.)  The Supreme Court has considered issues of international human rights in the course of conducting constitutional analysis.  *E.g.*, *Lawrence*, 539 U.S. at 573 (citing a decision by the European Court of Human Rights).  But even assuming that "permitting greater sexual self-expression [is] congruent with international human rights instruments and norms," Smith, 15 Colum. J. Gender & L. at 187, that does not mean that denial of the specific accommodation that Morales seeks violates those norms or, more importantly, the Constitution. Moreover, the UDHR is "merely aspirational" and was "never intended to be binding on member States of the United Nations."  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 259 (2d Cir. 2003).  The Geneva Conventions codify the law of war, *Kadic v. Karadžić*, 70 F.3d 232, 242 (2d Cir. 1995); they have no application to this case.

Here, the DOC's policies are validly and rationally connected to the legitimate purposes of preventing violence and maintaining prison security.  In *Senkowski*, the Second Circuit affirmed a grant of summary judgment and upheld a prison policy that prohibited possession of nude or semi-nude photographs of inmates' spouses or girlfriends.  The court made the "common sense determination" that introduction of such photographs into prisons "may provoke violence."  *Senkowski*, 54 F.3d at 1055.[20]  The result is the same here.  Even assuming that there are certain sexual interactions in correctional facilities that pose no threat to prison safety and security, there are also sexual interactions that do affect safety and security in those facilities.  Banning all sexual interactions may not be the most nuanced solution, but it certainly qualifies as having a valid, rational connection to preventing prison violence and promoting safety. *See Shakur*, 391 F.3d at 114 ("'[T]here is no requirement that prison officials adopt the least restrictive alternative to their preferred policy.'" (quoting *Senkowski*, 54 F.3d at 1055)).  That conclusion is reinforced by the fact that the Court accords "substantial deference to the informed judgment of prison officials on matters of prison administration."  *Senkowski*, 54 F.3d at 1055.

The second *Turner* factor is whether there are alternative means for the prisoner to exercise the right at issue.  "'[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a

---

[20]  In an earlier case involving the same issue, the Second Circuit vacated a judgment of dismissal entered after the District Court dismissed the complaint sua sponte.  *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam).  Morales's case has not advanced to the summary judgment stage, but neither has he been deprived of an opportunity to be heard.  Indeed, Morales articulates his positions at length in his Complaint and his opposition to Defendant's Motion.

court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'" *Shakur*, 391 F.3d at 114 (quoting *Turner*, 482 U.S. at 91).  Here, if the right is framed as the right of all prisoners to engage in consensual sexual activity,[21] then it is fair to say that, under current DOC policy, there are no alternative means for prisoners to exercise that "right" without risking disciplinary action.[22]  However, Morales has not pointed to an alternative that would have a *de minimis* cost to the DOC's safety and security interests.  In addition, as described above, there is no such right under *Hernandez*, and the Supreme Court's decision in *Lawrence* did not alter that fact.  Even assuming that there is a more generalized right for all persons, including prisoners, to be free from "undue interference" with their "sexuality," *Back*, 365 F.3d at 118 n.6, the interference caused by the DOC's policies is not "undue" for the reasons stated herein.

*Turner*'s third prong requires an inquiry into the impact that the desired accommodation would have on guards, other inmates, and prison resources.  Certainly the violence and security breaches that the DOC policies seek to avoid would have an adverse impact on guards, other inmates, and prison resources.  *See Senkowski*, 54 F.3d at 1056.  And even assuming that there are some sexual interactions that pose no risk to security or risk of violence in a prison setting, it would still be necessary to discern whether or not a particular interaction is one of them—no easy task given the myriad potential types of sexual expression that might occur in correctional facilities.  Morales

---

[21]  Indeed, that is how Morales himself frames it; he maintains that he has a "right to engage in sexual activity with another consenting adult."  (Doc. 6-1 at 31; *see also* Doc. 13 at 18.)

[22]  Morales supplies a list of things that he says cannot make up for the lack of sexual intimacy. (*See* Doc. 6-2 at 1–2.)

seems to suggest that this could be done (*see* Doc. 6-1 at 26, 62–63), but has not indicated how that might be accomplished, much less how to do so without straining prison resources.

All of the discussion above applies regardless of the inmate's sexual orientation. However, it remains to consider Morales's argument that the PREA and Policy 410.01's ban on sexual acts and activity have a discriminatory effect on homosexual prisoners.  As noted above, Morales claims that the PREA has a discriminatory effect because homosexuals "are the focus of virtually every PREA investigation in Vermont's correctional facilities."  (Doc. 13 at 12.)  He also claims that Policy 410.01's ban violates equal protection and is "based on anti-LGBTQ prejudice."  (Doc. 6-1 at 28.)

"In order for a prisoner to state a violation of the Fourteenth Amendment Equal Protection Clause, he 'must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'"  *Davis v. Pallito*, No. 5:10-CV-154, 2011 WL 4443026, at *11 (D. Vt. June 16, 2011) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)), *adopted*, 2011 WL 4443008 (Sept. 22, 2011).  "'He must also show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that this treatment was not reasonably related to any legitimate penological interests.'"  *Id.* (quoting *Phillips*, 408 F.3d at 129).

"[I]ntentional discrimination can be proven in several ways."  *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006).  Here, neither the PREA nor Policy 410.01's ban makes any express distinction on the basis of sexual

orientation.  However, "'[a] law which is facially neutral violates equal protection if it is applied in a discriminatory fashion.'"  *Id.* (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)).  "Government action also violates principles of equal protection 'if it was motivated by discriminatory animus and its application results in a discriminatory effect.'"  *Id.* (quoting *Hayden*, 180 F.3d at 48).  "Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a 'prima facie case of discriminatory purpose.'"  *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 241 (1976)).

Here, Morales appears to challenge the PREA and Policy 410.01's ban as being applied in a discriminatory fashion.  (*E.g.*, Doc. 6-11 at 5–6) (asserting that he has never been disciplined "for playfully flirting with a female nurse, staff member, visitor, or volunteer").  But Morales does not allege that the "playful flirtation" constitutes sexual proposals or acts.  Morales also alleges that the PREA and Policy 410.01's ban are motivated by discriminatory animus and result in a discriminatory effect.  As to discriminatory effect, it may be that most inmates who are investigated under the PREA or who are disciplined for violating Policy 410.01's ban are homosexual or bisexual, since presumably heterosexual inmates in the DOC's same-sex prisons have little interest in sexual activity with other inmates.  *But see* Smith, 15 Colum. J. Gender & L. at 209–10 (noting the phenomenon of "situational" sexuality in prison, in which some inmates who do not identify as gay or lesbian might have sex with other inmates of the same sex).

However, assuming that Morales could show a disparity of treatment that resulted from intentional discrimination, he would still need to show that the disparity was not

reasonably related to any legitimate penological interests.  For the reasons discussed above, any disparity in treatment survives even the heightened standard of review under *Turner*.

### III.   Leave to Amend

The Second Circuit has cautioned that district courts should not dismiss *pro se* complaints with prejudice without granting leave to amend at least once "'when a liberal reading of the complaint gives any indication that a valid claim might be stated.'"  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Nonetheless, leave to amend may be denied in certain circumstances, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

For all of the above reasons, I conclude that Morales has failed to state a § 1983 claim.  I further conclude that additional factual allegations or development will not cure the deficiencies discussed above.  Accordingly, the Court should GRANT Pallito's Motion to Dismiss (Doc. 12) and decline to grant leave to amend.

**IV.    Morales's Motions to Appoint Counsel**

Given the above recommendations, the Court should DENY Morales's Motions to Appoint Counsel (Docs. 3, 14) as moot.

## Conclusion

For the reasons set forth above, I recommend that Morales's Motion on the issue of default judgment (Doc. 20) be DENIED, that Pallito's Motion to Dismiss (Doc. 12) be GRANTED, and that Morales's Motions to Appoint Counsel (Docs. 3, 14) be DENIED as moot. The Court should accordingly DISMISS Morales's Complaint (Doc. 6).

Dated at Burlington, in the District of Vermont, this 31st day of March, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).